# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 15, 2014

## STATE OF TENNESSEE v. RONNIE LAWRENCE CORRAL

**Direct Appeal from the Circuit Court for Robertson County**
**No. 2010CR284     Michael R. Jones, Judge**

**No. M2013-00764-CCA-R3-CD - Filed June 9, 2014**

Defendant, Ronnie Corral, was indicted in a 16-count indictment for five counts of attempted first degree murder; five counts of aggravated assault; three counts of facilitation of attempted aggravated robbery; one count of aggravated robbery; one count of attempted aggravated robbery; and one count of aggravated burglary. Following a jury trial, Defendant was convicted of five counts of facilitation of attempted first degree murder; four counts of aggravated assault; one count of facilitation of aggravated assault; four counts of facilitation of attempted aggravated robbery; one count of aggravated robbery; and one count of aggravated burglary. Defendant's four convictions for facilitation of attempted aggravated robbery were merged with three of his aggravated assault convictions and his conviction for facilitation of aggravated assault, and his remaining aggravated assault conviction was merged with his aggravated robbery conviction. For his convictions, Defendant received a total effective sentence of ten years. Defendant appeals his convictions and sentences and asserts: 1) the trial court abused its discretion by declining to grant a mistrial after the trial court allowed inadmissible hearsay to be admitted; 2) the evidence was insufficient to support his convictions for aggravated robbery and facilitation to commit first degree premeditated murder; and 3) the trial court erred in sentencing Defendant to more than the minimum sentence in the applicable sentencing range. After a thorough review of the record, we find no error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ROBERT W. WEDEMEYER, J., joined.

H. Garth Click, Springfield, Tennessee, (on appeal); and Roger Eric Nell, District Public Defender; Timothy Joseph Richter, Assistant Public Defender; for the appellant, Ronnie Corral.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Jason White, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

*Facts*

On the night of March 5, 2010, and into the early morning hours of March 6, Veronica Miles, Ocena Jones, and Jackie Ann Lee Alvarez went to a trailer occupied by five Hispanic men. While they were there, Ms. Alvarez engaged in prostitution with one of the men. The three women then left the trailer and drove to a nearby market in Tramont Moody's vehicle. While inside the market, Ms. Alvarez spoke to Tramont Moody, Defendant, and Jeremy Evitts. The women then returned to the trailer to smoke marijuana with the Hispanic men. They were about to smoke a "blunt" when they heard "banging on the windows" and a gun being fired at the trailer door. Ms. Jones and Ms. Miles saw Defendant enter the trailer wearing a black or gray hoodie and a stocking cap. He was carrying a baseball bat. Defendant entered the trailer with Mr. Evitts and Mr. Moody. Ms. Jones and Ms. Miles ran outside. The Hispanic men went to the bedroom. As Ms. Jones and Ms. Miles fled, they heard a gunshot fired inside the trailer. The police arrived just as Ms. Jones and Ms. Miles exited the trailer. Ms. Jones yelled to the police that she thought someone had been shot.

Rogelio Reyes testified that he and Reidaldo Evangelita lived in the trailer where the incident occurred. On the night of the incident, Esteban Salazar, Josue Contreras, and Paul Guia, were visiting. Mr. Evangelista was in his bedroom asleep, and the other four men were drinking beer. Mr. Reyes testified that Mr. Guia was "talking" to the three women who came over. The women left but returned again to retrieve a phone they said they left behind. Mr. Contreras went outside to smoke a cigarette and then went back inside and told Mr. Reyes that "there were some people outside who were going to assault [them]." Mr. Reyes shut the door to the trailer. The perpetrators then "started breaking the windows and shooting." Mr. Reyes and his friends barricaded themselves in Mr. Evangelita's bedroom. Shots were fired into the bedroom, and Mr. Guia was shot in the leg. Mr. Reyes testified that the intruders were banging on the door with something that sounded like a baseball bat. The intruders said that they wanted money and keys to Mr. Guia's truck which was parked outside. The victims told them that they did not have any money and that the keys were beside the truck. Mr. Reyes testified that he was not able to identify the intruders. He did not give them permission to enter his home. Mr. Reyes was afraid of being shot.

When police arrived, the victims came out of the bedroom. Mr. Reyes found a jar of coins and a stereo belonging to him on the front porch. The items had been in the living

room before the home invasion. There was broken glass around the window that had been shattered, and the contents of the trailer were in disarray. The police had Defendant and his two co-defendants in custody on the front porch of the trailer. One of the men made threats in Spanish to Mr. Reyes, including comments about a gang, money, and death. Mr. Reyes denied that he had bought drugs from the men.

Esteban Salazar was at Mr. Reyes' trailer when the incident occurred. He testified that he and his friends were drinking beer in the living room. Mr. Salazar did not see the intruders' faces. He testified that the men were cussing and breaking the windows with a bat. Three men entered the trailer and demanded money. The men were shooting, and Mr. Salazar was afraid of being killed.

Officers Andrew Cobb and Brant Holt, of the Springfield Police Department, were patrolling the area on the night of the incident. They responded to a call that the home had been forcibly entered. When they arrived, Officer Cobb saw two women coming out of the trailer. One of the women told him, "they're in there," and Officer Cobb heard people yelling and loud banging inside the trailer. He noticed that the front door was kicked in, and there was a stereo and a bowl of change "strewn all over the porch[.]" Tramont Moody came out of the trailer first, and Officer Holt detained him. Officer Cobb saw Defendant come out from one of the bedrooms carrying a baseball bat. Officer Cobb and Officer Holt detained Defendant and Jeremy Evitts. They then called for the victims to exit the trailer. One of the victims had suffered a gunshot wound to his knee. The trailer was in disarray and damaged from forced entry into the front door and back bedroom door.

Officers recovered a revolver, a BB gun, bullet fragments, and a baseball bat. Officer Holt testified that after Defendant and the co-defendants were taken into custody, Defendant was speaking in Spanish. Officer Holt testified that he understood Spanish, but did not speak fluently. He understood Defendant say "muerte," which means "death," and "punto," which means "bitch." Officer Holt testified that Defendant's demeanor was angry and that he was "gritting" his teeth and took a step toward the victims in a "jerking motion."

Officer Elizabeth Leonardo was also called to the scene. When she arrived, Defendant and the two co-defendants were in custody on the front porch of the trailer home. Officer Leonardo took photographs of the scene. She observed a bullet hole in the bedroom door and a bullet inside the bedroom.

When Detective Terry Doris arrived at the scene, Defendant was in the back of a patrol car because he had been "kind of combative." Detective Doris walked through the scene, collected evidence, and took photographs. He collected fingerprints from the glass bowl that contained coins, but fingerprint analysis did not match the prints to any known

individual. Detective Doris also later interviewed Ms. Jones and Ms. Miles. Detective Doris testified that the two women's accounts of the incident were consistent with each other.

*Analysis*

*Failure to grant a mistrial*

Defendant contends that the trial court abused its discretion by not sua sponte granting a mistrial after the State elicited inadmissible hearsay testimony from one of its witnesses who testified that Defendant and his co-defendants lived together. During direct examination by the State, Detective Doris testified as follows:

> Q. And when you get to looking at Mr. Moody, Mr. Corral, and Mr. Evitts, if any, were you able to establish any connection between the three?
>
> A. Yes, sir. Through my investigation, I was able to determine that they either lived together or . . . stayed together.

Defense counsel objected on the basis of hearsay, and the trial court sustained the objection. The court also instructed the jury "not [to] consider whatsoever that statement." The trial court instructed the prosecutor that, "[o]r through investigation is not proper." The prosecutor then asked Detective Doris whether he knew of the co-defendants' living situation through hearsay or personal knowledge, and Detective Doris responded that he had personal knowledge. The trial court ordered a jury-out hearing, during which the trial court ruled that the testimony was hearsay. The trial court again instructed the jury, "the last portion of Detective Doris's testimony in reference to whether [the co-defendants] knew each other or lived together is to be totally disregarded and don't consider it for any purpose." Defense counsel did not request a mistrial. Defendant now asserts that the trial court should have sua sponte granted a mistrial.

The decision of whether to grant a mistrial is within the sound discretion of the trial court. *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). Normally, a mistrial should be declared only if there is a manifest necessity for such action. *Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). One description of manifest necessity is that, "[i]f it appears that some matter has occurred which would prevent an impartial verdict from being reached," a mistrial must be declared. *Id*. Additionally, a manifest necessity exists when "no feasible alternative to halting the proceedings" exists. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981). The defendant bears the burden of establishing a manifest necessity. *State v. Seay*, 945 S.W.2d 755, 764 (Tenn. Crim. App. 1996). This

-4-

court will not disturb that decision unless there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990); *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

In determining whether a mistrial is warranted because of inappropriate testimony of a witness, our supreme court has used the following three nonexclusive factors: "(1) whether the State elicited the testimony, or whether it was unsolicited and unresponsive; (2) whether the trial court offered and gave a curative jury instruction; and (3) the relative strength or weakness of the State's proof." *State v. Nash*, 294 S.W.3d 541, 547 (Tenn. 2009) (citing *State v. Smith*, 893 S.W.2d 908, 923 (Tenn. 1994)).

We conclude the Defendant has not shown a clear abuse of discretion on the part of the trial court. In the case sub judice, the State elicited the testimony of Detective Doris regarding the relationship between the three co-defendants. After the trial court ruled during a jury-out hearing that the testimony was inadmissible hearsay, the prosecutor stated, "I'll leave the subject alone. I don't want to risk going any further." The court twice instructed the jury to disregard the statement. We presume jurors follow the curative instructions of the trial court. *State v. Stout*, 46 S.W.3d 689, 715 (Tenn. 2001); *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998). Finally, the State presented a strong case against Defendant. The testimony does not, therefore, demonstrate a manifest necessity requiring a mistrial. Defendant is not entitled to relief on this issue.

*Sufficiency of the evidence*

Defendant contends that the evidence is insufficient to support his convictions for aggravated robbery and facilitation of attempt to commit first degree murder.

Our review of a defendant's challenge to the sufficiency of the evidence to sustain a conviction is governed by well settled principles of law. Our standard of review regarding sufficiency of the evidence is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the

strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Id*. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. *State v. Dorantes*, 331 S .W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In *Dorantes*, our supreme court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *Id*. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. *Id*.

Defendant was convicted in Count 6 of aggravated robbery. "Aggravated robbery is robbery as defined in § 39-13-401 . . . [and] [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-401(a) defines robbery as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id*.

Defendant asserts that the evidence was insufficient to show that a theft of property occurred. The proof at trial showed that Defendant and his two co-defendants broke windows and shot into the trailer to get inside. After they entered the trailer, shots were fired into the bedroom. They were cursing and saying that they wanted money and keys to Mr. Guia's truck parked outside. Mr. Reyes was "[s]cared" of being shot. Mr. Reyes had not given them permission to enter his home. When police arrived at the scene, they observed a stereo and a bowl of coins strewn across the front porch. Mr. Reyes testified that those items had not been on the porch prior to the incident and that they were normally kept in the living room. The evidence is sufficient for the jury to have reasonably inferred that Defendant and his co-defendants removed the items from the home.

Defendant also contends that the evidence was insufficient to support his convictions for facilitation of attempted first degree premeditated murder. "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a). "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). "First degree murder is . . . [a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1).

-6-

Defendant cites *State v. Jason D. Pillow*, No. M2002-01864-CCA-R3-CD, 2004 WL 367747 (Tenn. Crim. App. Feb. 27, 2004), *perm. app. denied* (June 21, 2004). In *Pillow*, the defendant and two others went to the victims' residence to rob them. The defendant actively participated in the robbery and fired his weapon during a confrontation with the victims. In affirming the defendant's convictions for facilitation of attempted first degree premeditated murder, a panel of this court concluded that the jury could have reasonably inferred that the initial intent to rob the victims became an intent to murder the victims when a co-defendant shouted, "'[K]ill that ni****.'" *Id*. at *6. Defendant attempts to distinguish this case from *Pillow*, arguing that unlike the defendant in *Pillow*, Defendant was not armed with a gun, he did not directly confront the victims, and that no statements were made during the incident indicating an intent to murder the victims.

A view of the evidence in a light most favorable to the State shows that Defendant arrived with the co-defendants at the home of the victims. Defendant was an active participant in the invasion, using a baseball bat to forcibly enter the home while a co-defendant fired shots at the victims. After the police arrived, Defendant made threats in Spanish to the victims, using the word "death." Mr. Reyes and Mr. Salazar feared that the intruders would kill them. The fact that Defendant's threats toward the victims were made while he was in police custody, rather than during the home invasion, does not prevent the jury from considering that proof and reasonably concluding that the men intended to kill the victims from the beginning of the incident. We conclude that the evidence is sufficient to support Defendant's convictions. Defendant is not entitled to relief on this issue.

*Sentencing*

Defendant contends that the trial court erred in sentencing him. Defendant cites an incorrect standard of review and argues that the trial court failed to properly apply a mitigating factor in determining Defendant's sentence. Specifically, Defendant contends that the trial court should have applied as a mitigating factor that Defendant suffered from a "mental illness that affected [him] at the time of the commission of the offense." *See* Tenn. Code Ann. § 40-35-113(8).

Appellate review of sentencing decisions is now based on an abuse of discretion standard. This court must apply "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, first determines the range of sentence and then determines the specific sentence and the appropriate combination of sentencing alternatives by considering: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and

arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts regarding sentences for similar offenses; (7) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (8) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); *State v. Williams*, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The trial court is still required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. *See Bise*, 380 S.W.3d at 706 n. 41; *State v. Samuels*, 44 S.W.3d 489, 492 (Tenn. 2001). Thus, a sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute.

At the sentencing hearing, Defendant testified that he was 34 years old and that he had obtained his GED. He testified that he was in "poor" health and that he had degenerative disc disease, cancer, and "mental disabilities" for which he took medication. Defendant also testified that he had used drugs and alcohol since he was ten years old. Defendant testified that he drank "about seven" 32-ounce "King Cobras" before the incident. He testified that he did not intend for any of the victims to be shot. Defendant believed that if he had been sober on the night of the incident, he would not have participated in the invasion. Defendant claimed that one of the victims had robbed him earlier. Defendant stated that he was just "along for the ride," but that he was "there to try to get the money [he] got robbed for."

At the conclusion of the sentencing hearing, the trial court rejected Defendant's alleged mental condition and Defendant's intoxication as mitigating factors, stating,

> there's been no showing that [Defendant's mental condition] truly had anything to do with the offense itself. The use of alcohol is not a mitigating factor in this Court's judgment under these [statutory mitigating factors], since that would have been voluntary use of intoxicants. So he was not suffering from a mental or physical condition that significantly reduced his culpability. I do not find that whatsoever.

We conclude that the trial court properly applied the principles and purposes of the Sentencing Act. *See Bise*, 380 S.W.3d at 707. The trial court did not abuse its discretion in determining the length of each sentence. The trial court's sentencing decision was "within

the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709-10. Defendant is not entitled to relief on this issue.

After a careful review of the record and the briefs of the parties, we find no error and affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE